Gilbert Colgate v. Commissioner.
Colgate v. Commissioner
Docket No. 24782.
United States Tax Court
1950 Tax Ct. Memo LEXIS 1; 9 T.C.M. (CCH) 1178; T.C.M. (RIA) 50317; December 29, 1950
*1 Henry F. Matheis, C.P.A., 5 Maiden Lane, New York, N. Y., for the petitioner. Nicholas Tomasulo, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined a deficiency of $3,569.73 in income tax against the petitioner for the calendar year 1945. The issues involved are whether the respondent correctly disallowed (1) a deduction of $230 claimed as a long-term capital loss for worthlessness of forty-six shares of stock of Alfred Bruce, Inc., and (2) the deduction of $11,915 claimed as a short-term capital loss due to worthlessness of non-business loans to Alfred Bruce, Inc. Findings of Fact The petitioner, a resident of Long Island, New York, filed his income tax return for the year 1945 with the Collector of Internal Revenue for the Third District of New York. For some time prior to the fall of 1939, the petitioner had known Alfred Bruce. Bruce was engaged in public and employee relations work in the industrial field, and had been so engaged for some fifteen years. For a period of five years he had been director of public relations for the American Radiator & Standard Sanitary Corporation but had left its *2 employ and had opened a small office at 7 East 42nd Street, New York City. He had been doing some work for the Spencer Lawson Aircraft Corporation, later Colgate Manufacturing Corporation, in which the petitioner had an interest. The petitioner was impressed with Bruce's ability and decided to back him financially. It was thought that a better physical set-up would permit client solicitation on a broader basis. To effect the above plan, Alfred Bruce, Inc., was organized under the laws of New York on November 17, 1939, with an authorized capital of 125 shares of common stock, having a par value of $10 per share. Forty-six shares were issued to the petitioner, and 49 shares to Alfred Bruce. The petitioner paid $464 for his stock. Bruce contributed no cash, but was obligated to devote his full working time, until December 31, 1944, to the affairs of the corporation. Thereafter, from time to time, the petitioner made loans to Alfred Bruce, Inc., totaling $11,915, of which, loans aggregating $11,065 were evidenced by three notes; $6,225 by a note dated November 30, 1940; $2,840 by a note dated December 10, 1940; and $2,000 by a note dated April 30, 1941. The maturity date of the above *3 notes was November 30, 1944. The $6,225 note and the $2,840 note bore no interest. The funds advanced were used in renting office space, buying furniture and for other purposes of the business. Part of the money was applied on Bruce's salary. The success of the business being substantially dependent upon Bruce's experience, skill and ability, and the utilization thereof, a policy of insurance, payable to the corporation, was taken out on his life. The face amount of the policy was $7,500. From the organization of the corporation until August 20, 1942, Bruce applied himself to the conduct of the corporate business. During that period the business was largely in the development stage. From the beginning, it had one regular client, Colgate Manufacturing Corporation. In 1942, it added another client, the John B. Pierce Foundation. That Foundation was interested in the development of housing. In addition to work done for Colgate Manufacturing Corporation and Pierce Foundation, Bruce made a survey for the Santa Fe Railroad relating to low cost travel. This survey was particularly centered upon the development of service by one of its trains, the El Capitan. He also worked on the development *4 of a program for Connecticut General Life Insurance Company. Both of these programs were designed for peace-time economy and were laid aside until the war was over. So far as appears from the record, they merely represented possible or potential business after the conclusion of the war. Bruce worked on the program of the Pierce Foundation right up to the date of his entry into the armed services, after which a man by the name of Sandbank was sent to the offices of the Foundation to continue "at least a minimum of work" on the program during the war period. Alfred Bruce, Inc., from the date of its organization until Bruce entered the armed services, never attained better than a "break-even" point in its operations. Since the conduct of the business of Alfred Bruce, Inc., depended solely upon the efforts of Bruce individually, and understanding was reached between the petitioner and Bruce at the time Bruce entered the armed services that operations be suspended during his absence. The petitioner made an offer, which was accepted, placing a moratorium on the obligations owing by the corporation to him for the duration of the war and for six months thereafter. At the same time it was *5 agreed that Bruce's contract with the corporation should be revised to provide that the two years and some months remaining thereunder would again begin to run six months after the end of the war. The office space then occupied was vacated and the furniture was sold. Thereafter the proceeds from the furniture sale, amounting to approximately $500, constituted the only physical assets remaining to the corporation. The money in question was deposited in the corporate bank account and was applied, from time to time, to the payment of the New York state franchise tax and the premiums on the life insurance policy on Bruce's life. The last premium on the policy was paid at or about the close of 1944. Bruce was wounded on the beachhead at Salerno, Italy, on September 17, 1943, and was in the hospital for thirty-three months. In October of 1944, complications developed from his wounds, and he was told by army doctors that he might not live five years. At or about that time, the petitioner visited Bruce at the hospital and a discussion was had with reference to the future of Alfred Bruce, Inc. It was agreed that the corporation would remain inactive, in the hope that Bruce would recover and *6 be able to return to his job. Bruce had doubts as to whether he would want to undertake the rebuiling of the business. The petitioner suggested that decision be delayed, however, until they could see how Bruce fared. Subsequently Bruce was able to leave the hospital, and in August of 1945, he visited the offices of the Pierce Foundation in New York for the purpose of discussing a resumption of relations. He advised the Foundation that he was going West for a period, and it was decided that he should see them again upon his return. In September of 1945, Bruce developed osteomyelitis and his retirement from the army was indefinitely postponed. It was then decided that the operations of Alfred Bruce, Inc. be finally and conclusively abandoned and that its affairs be wound up. Pierce Foundation was advised of this decision. No further premiums were paid on the insurance and the corporation was dissolved. A very small amount remained in the bank account, the disposition of which does not appear of record. In reporting his income, the petitioner treated the $464 paid for stock in Alfred Bruce, Inc., as a long-term capital loss. The indebtedness owing to him by the corporation was treated *7 as a short-term capital loss. The deductions claimed were disallowed by the respondent on the ground that the stock and notes became worthless prior to 1945. The petitioner's losses on the stock of Alfred Bruce, Inc., and on the indebtedness of that corporation to him were sustained in 1945, when the affairs of the corporation were closed. Opinion The question for decision is one of fact and is whether the stock of Alfred Bruce, Inc., and the indebtedness owing by that corporation and due petitioner became worthless in 1945. There is no dispute between the parties as to the law. The determining factors differ somewhat from those in the usual case. Alfred Bruce, Inc., from the beginning of its business operations to the date of its dissolution, was at no time possessed of cash or physical assets sufficient to pay its debts. It never had physical assets other than its office furniture and comparatively small amounts of cash. There is nothing showing that it ever operated at a profit. The best information obtainable from the records is that in 1942 it was operating at about the "breakeven" point. Whatever the value of the stock and the obligations outstanding were they were represented *8 by the ability and standing of Bruce in his field of public and employee relations work and his obligation to serve the corporation for a period of five years. It is apparent, we think, from evidence of record that these tangible factors did have prospective value. The business prospects were such that Bruce was willing to continue his work up to the day before his entry into the armed services. He was actively working on the program of two organizations and had made surveys on two others, the latter being placed aside for attention after the end of the war. With respect to Pierce Foundation a minimum of work was to be continued from the office of the Foundation during Bruce's absence in the service. Because of the importance of Bruce and his services to the company a life insurance policy of a face value of $7,500 had been procured on his life and even though the activities of the corporation came to a complete standstill with his entry into the service, except for such things as might have been done on the Pierce Foundation project, the funds obtained from the sale of office furniture and equipment were placed in the corporation's bank account and applied as needed to the New York *9 franchise tax and payment of the premiums on the insurance policy on Bruce's life. In 1944, after Bruce had returned to this country, there was a time when he had doubts as to whether he would be interested in attempting a revival and building of the corporate business. He had been severely wounded at the Salerno beachhead and army doctors had advised him that he might not live beyond five years. The facts and conditions existing at that time offer rather persuasive support to the contention of the respondent that the stock and the debt became worthless prior to the taxable year. Even in the face of that situation, however, and after discussion between petitioner and Bruce, they agreed to continue the corporation as it had existed since his entry into the armed services and to wait further developments as to his health. The corporation was kept alive and the premium was paid on the policy of insurance on his life. His condition thereafter improved sufficiently to permit him to leave the hospital and in the summer of 1945 he visited the offices of the Pierce Foundation in New York City and conferred with them about the possibilities of resuming his work. It was agreed that he should *10 contact them after a planned visit in the West. While on the western trip further and serious complications arose with respect to Bruce's health and it was then concluded that there was no reasonable prospect for resumption of the corporation's business. Pierce Foundation was so notified and petitioner and Bruce decided to take the steps necessary to wind up and close out the affairs of the corporation. No further premiums were paid on the life insurance policy and all prospects of any realization by petitioner on the indebtedness and the corporate stock wholly disappeared. When the entire picture is considered, it is our view that, until the illness of Bruce while on the western trip in 1945, it may not be said that the stock and obligations of the corporation were worthless. As pointed out in the beginning, it is true that at no time after operations began was the corporation possessed of physical assets and cash sufficient to pay its debts but it was at all times the owner of a contract for Bruce's services. He was a man of experience and of demonstrated ability in his field and at the time of entry into the service he had built the corporate business up to at least a "break-even" *11 point and foundation work had been done toward the acquisition of further business. Its established business with Colgate and Pierce Foundation was still available to it. It is true that the prospects for future operation did reach a low point in 1944 when army doctors expressed the view that Bruce might not live beyond five years, but even in that situation the corporation still had the policy of insurance on Bruce's life and his death would have made $7,500 available for application on the corporate obligations. This situation continued into 1945 and came to an end in that year when the insurance policy was allowed to lapse. Pierce Foundation was advised that work would not be resumed and the affairs of the corporation were closed and wound up. It is accordingly our conclusion, and we have found as a fact, that petitioner sustained his losses on the stock and indebtedness of Alfred Bruce, Inc. in 1945 and is entitled to deductions therefor as claimed. Decision will be entered for the petitioner.